**EXHIBIT D**

2015 WL 4611950
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS DESIGNATED AS UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINN. ST. SEC. 480A.08(3).

Court of Appeals of Minnesota.

Cheryl A. HANSEN, Appellant,
v.
The NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, Respondent.

No. A14–1703.
|
Aug. 3, 2015.

Hennepin County District Court, File No. 27–CV–13–16815.

**Attorneys and Law Firms**

Scott M. Flaherty, Elise L. Larson, Robert J. King, Jr., Briggs and Morgan, P.A., Minneapolis, MN, for appellant.

Erik T. Salveson, Benjamin C. Johnson, Nilan Johnson Lewis, P.A., Minneapolis, MN, for respondent.

Considered and decided by BJORKMAN, Presiding Judge; SCHELLHAS, Judge; and STAUBER, Judge.

**UNPUBLISHED OPINION**

BJORKMAN, Judge

***1** Appellant-insured challenges summary judgment dismissing her claim for total-disability benefits. We affirm.

**FACTS**

Appellant Cheryl A. Hansen, M.D., is a board-certified obstetrician/gynecologist. In 2001, Dr. Hansen joined Western OB/GYN in Waconia. Her practice included the full range of OB/GYN services, including deliveries, surgeries, routine examinations, counseling, and cancer screenings.

Dr. Hansen has epilepsy. On May 16, 2012, she experienced a syncope episode while performing surgery, which caused her to lose consciousness. She eventually returned to work with restrictions, including having another surgeon present during all surgical procedures. On September 14, the restrictions were lifted. In early November, Dr. Hansen experienced a second syncope episode, after which her physician advised her that she could no longer safely perform deliveries or surgical procedures. Dr. Hansen did not return to work at Western OB/GYN.

At all relevant times, Dr. Hansen had disability insurance with respondent Northwestern Mutual Life Insurance Company. The insurance policy covers both partial and total long-term disability, defined as follows:

> **Total Disability**.... After the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation and is not gainfully employed in any occupation.
>
> **Partial Disability.** The Insured is partially disabled when:
>
> - he is unable to perform one or more principal duties which accounted for at least 20% of the time he spent at his occupation before the disability started; or
> - he has at least a 20% loss of time spent at his occupation.

On November 29, Dr. Hansen notified Northwestern Mutual of her intention to seek long-term disability benefits. Northwestern Mutual determined that she became partially disabled on May 16, the date of her first syncope episode, and began making payments. Northwestern Mutual requested Dr. Hansen's billing records for the year preceding and seven-and-one-half months after the first episode in order to evaluate the extent of her disability. After reviewing the CPT codes [1] associated with the billing records, Northwestern Mutual determined that Dr. Hansen's non-surgical gynecologic duties accounted for 63% of her pre-disability duties (and 33% of the related charges), and that Dr. Hansen is still able to perform those duties. Accordingly, Northwestern Mutual denied Dr. Hansen's claim for total-disability



Exhibit D

benefits. Dr. Hansen continues to receive partial-disability benefits.

Dr. Hansen commenced this action, seeking a declaration that she is entitled to total-disability benefits. She asserts that her inability to perform surgeries, deliver babies, cover call, and perform obstetrics-related work renders her totally disabled as defined by the policy. Northwestern Mutual moved for summary judgment. In opposing the motion, Dr. Hansen submitted affidavits from two experts, Nancy Cooley, M.D., and Edward Beadle, M.D., opining that Dr. Hansen is unable to perform any of her principal duties. Dr. Hansen also moved for summary judgment.

***2** The district court granted Northwestern Mutual's motion, concluding that "[u]nder no reasonable interpretation of the policy and this record, can the broad constellation of duties that [Dr. Hansen] continues to be able to perform be considered non-principal duties of an OB/GYN." Dr. Hansen appeals.

## DECISION

On appeal from summary judgment, we review de novo whether there are any genuine issues of material fact and whether the district court erred in applying the law. *Ruiz v. 1st Fid. Loan Servicing, LLC,* 829 N.W.2d 53, 56 (Minn.2013). We view the evidence in "the light most favorable to the party against whom summary judgment was granted." *STAR Centers, Inc. v. Faegre & Benson, L.L.P.,* 644 N.W.2d 72, 76–77 (Minn.2002). A genuine issue of material fact exists when there is sufficient evidence that could lead a rational trier of fact to find for the nonmoving party. *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997).

### I. The policy language is unambiguous.

"Interpretation of an insurance policy, and whether a policy provides coverage in a particular situation, are questions of law that we review de novo." *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.,* 825 N.W.2d 695, 704 (Minn.2013). An insurance policy, like other contracts, is governed by its terms. *Bobich v. Oja,* 258 Minn. 287, 294, 104 N.W.2d 19, 24 (1960). Accordingly, we interpret policy terms in their plain and ordinary sense to effectuate the intent of the parties. *Jenoff, Inc. v. N.H. Ins. Co.,* 558 N.W.2d 260, 262 (Minn.1997). And we read particular terms in the context of the entire policy, seeking to give effect to all of the policy provisions. *Eng'g & Constr. Innovations, Inc.,* 825 N.W.2d at 705. A policy provision is ambiguous if it is susceptible to more than one reasonable interpretation. *Medica, Inc. v. Atl. Mut. Ins. Co.,* 566 N.W.2d 74, 77 (Minn.1997). When construction of an ambiguous provision depends on extrinsic evidence, it is a question of fact for the jury. *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979).

In her principal brief, Dr. Hansen asserted that the insurance policy is ambiguous because the district court rejected her argument that the term "principal duties" should be interpreted in accordance with the Merriam–Webster Dictionary to mean "most important, consequential, or influential." But Northwestern Mutual does not challenge this definition, and we agree that "principal duties" is synonymous with "most important, consequential, or influential duties." And close examination of the district court's order reveals that the court only rejected Dr. Hansen's suggestion that an insured can have only one principal duty. We agree with the district court. The policy clearly provides that an insured "is totally disabled when he is unable to perform the principal duties of his occupation." And an insured is partially disabled when he is not able "to perform one or more principal duties which accounted for at least 20% of the time he spent at his occupation before the disability started." Read together, these provisions clearly state that an insured may have more than one principal duty, and that an insured is not totally disabled when he may still perform at least one of his principal duties. Because we discern no ambiguity in the policy language, we turn to whether there is a factual dispute concerning Dr. Hansen's ability to perform her principal duties.

### II. Dr. Hansen is not entitled to total-disability benefits as a matter of law.

***3** Dr. Hansen argues that there are genuine fact issues as to whether she is totally disabled. She points to her deposition testimony—including the substantive changes she made when reviewing the transcript pursuant to Minn. R. Civ. P. 30.05—and the affidavits of her experts to support her contention that a jury trial is required. We are not persuaded.

It is undisputed that Dr. Hansen is still able to perform non-surgical gynecologic services. Her own expert, Dr.

Carrie Terrell, analyzed the CPT codes and determined that such services accounted for approximately 42% of Dr. Hansen's pre-disability production units and 23% of her charges. Indeed, non-surgical gynecologic services accounted for more of her production units than any other category of services.[2] Dr. Hansen's testimony is consistent with the CPT code analysis. She stated that prior to the onset of her disability, she devoted more than three days a week to office visits. Some of that time involved in-office surgical procedures that she can no longer perform, but a large percentage was spent providing non-surgical gynecologic services.

Dr. Hansen's amended deposition testimony does not create a genuine issue of material fact as to whether she can still perform at least some of her principal duties. Contrary to Northwestern Mutual's assertion, a deponent may use an errata sheet to make "changes in form or substance" to deposition testimony. Minn. R. Civ. P. 30.05. Following her deposition, Dr. Hansen made several substantive changes, including that she had misspoken when she stated she can still treat urinary incontinence because some treatment requires surgery. But she did not change her testimony that she can still perform general counseling services, annual checkups, cancer screenings, osteoporosis diagnosis and treatment, premenstrual syndrome treatment, infertility treatment, contraceptive treatment, and menopause management.

Dr. Hansen next asserts that summary denial of her claim for total disability benefits impermissibly ignores the affidavit testimony of her medical experts. We disagree. The experts do not opine that Dr. Hansen is unable to provide non-surgical gynecologic services. Rather, they state that such services are secondary to the principal duties of delivering babies and performing surgical procedures. Dr. Beadle opined that "[t]he specialty of obstetrics and gynecology involves the delivery of babies and the performance of all variety of surgeries and procedures" and that it is "a fundamentally surgical practice." Dr. Cooley stated that office work is secondary to the principal duties of an OB/GYN, which she identified as "obstetrical deliveries, both vaginally and surgically as well as gynecological surgeries and procedures." Dr. Cooley explained that she does not consider non-surgical gynecologic work a principal duty because a physician cannot maintain a viable practice providing only such services. But the insurance policy does not condition entitlement to total-disability benefits on an insured's employability. In other words, the relevant inquiry is not whether Dr. Hansen is unable to maintain a practice, but rather whether she is unable to perform any of the principal duties of an OB/GYN. While delivering babies and performing surgery are unquestionably principal duties of an OB/GYN, they are not the only principal duties. The undisputed fact that Dr. Hansen can still provide services that comprised 42% of her production before the onset of her disability establishes that she is not totally disabled.

***4** Our conclusion finds support in cases from other jurisdictions that have addressed similar circumstances. *See Socas v. Nw. Mut. Life. Ins. Co.,* 829 F.Supp.2d 1262, 1272 (S.D.Fla.2011) (concluding that a dentist who could no longer perform oral surgery or advanced dental procedures but was still able to provide general dentistry services was able to perform some principal duties of a dentist); *Hershman v. UNUMProvident Corp.,* 660 F.Supp.2d 527, 532, 533–34 (determining that a cardiologist who could no longer perform invasive procedures but could still perform consultative duties was not totally disabled when a substantial portion of the doctor's pre-disability practice was devoted to consultative duties); *Provident Life & Acc. Ins. Co. v. Knott,* 128 S.W.3d 211, 219–20 (Tex.2003) (concluding that an OB/GYN who could no longer perform deliveries or many surgeries but could still provide general services was not totally disabled).

In sum, the policy clearly provides total-disability benefits when the insured is unable to perform any of her principal, most important duties. Because the undisputed evidence shows that Dr. Hansen is still able to perform some of her most important duties, she is not entitled to receive total-disability benefits.

**Affirmed.**

**All Citations**

Not Reported in N.W.2d, 2015 WL 4611950

Footnotes

1 CPT codes are "numbers assigned to every task and service a medical practitioner may provide to a patient including medical, surgical and diagnostic services."

2 The CPT codes are organized into the following categories: gynecologic office visits, deliveries, obstetrics office visits and follow-ups, obstetrics surgeries, gynecologic surgeries (in operating room), and gynecologic surgeries (office-based).

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT E**

2017 WL 2623070

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Supreme Court of Texas.

IN RE Dean DAVENPORT, et al., Relator

No. 15-0882
|
Argued March 23, 2017
|
OPINION DELIVERED: June 16, 2017

**Synopsis**

**Background:** Attorneys filed suit against client to recover unpaid attorney fees. Following jury verdict for client, the trial court granted motion for new trial. Client filed petition for writ of mandamus. The San Antonio Court of Appeals, 2015 WL 6510955, denied petition. Client filed petition for writ of mandamus.

**[Holding:]** The Supreme Court, Willett, J., held that fee agreement did not permit attorneys to recover ownership interest as attorney fees.

Petition for writ of mandamus conditionally granted.

Boyd, J., filed concurring opinion in which Lehrmann, J., joined.

West Headnotes (17)

[1] **New Trial**
Discretion of court

A trial court has discretion to grant a new trial for good cause; however, this discretion has limits. Tex. R. Civ. P. 320.

Cases that cite this headnote

[2] **Mandamus**
New trial or rehearing

An appellate court may by mandamus direct a trial court to vacate a new trial order in one of three ways: (1) when a merits-based review of the record establishes that the trial court abused its discretion, (2) when the trial court's order was void, or (3) when the trial court erroneously finds that the jury's answers to special issues are irreparably conflicting.

Cases that cite this headnote

[3] **New Trial**
Order Granting or Refusing New Trial

A new trial order must be understandable, reasonably specific, cogent, legally appropriate, specific enough to indicate that the trial court did not simply parrot a pro forma template, and issued only after careful thought and for valid reasons.

Cases that cite this headnote

[4] **Attorney and Client**
Effect as creating interest in subject-matter of litigation

Fee agreement between attorneys and client, which provided that attorneys would receive 40% of total sums recovered, did not permit attorneys to recover ownership interest as attorney fees but only allowed for recovery of money, even though agreement contained clause stating that attorneys would not take a fee out of ownership of two specific businesses; term "sum" referred only to a quantity of money, there was no basis to construe clause to mean that attorneys were entitled to take fee out of other ownership interests, and agreement did not state how recovery from a non-cash award would be calculated.

Cases that cite this headnote

[5] **Contracts**
Ambiguity in general

Whether a contract is ambiguous is a matter of law for the court.



Exhibit E

Cases that cite this headnote

[6] **Contracts**
Existence of ambiguity
A contract is considered ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one interpretation.

Cases that cite this headnote

[7] **Contracts**
Language of Instrument
When construing a contract, the terms are typically given their plain, ordinary, and generally accepted meaning.

Cases that cite this headnote

[8] **Contracts**
Language of Instrument
Courts may look to dictionaries to discern the meaning of a commonly used term that a contract does not define.

Cases that cite this headnote

[9] **Contracts**
Application to Contracts in General
An unambiguous contract will be enforced as written.

Cases that cite this headnote

[10] **Contracts**
Construction as a whole
A court must read contractual provisions so none of the terms of the agreement are rendered meaningless or superfluous.

Cases that cite this headnote

[11] **Contracts**
Rewriting, remaking, or revising contract
Courts may not rewrite the parties' contract, nor should courts add to its language.

Cases that cite this headnote

[12] **Contracts**
Rewriting, remaking, or revising contract
A court cannot make new contracts between the parties and must enforce the contract as written.

Cases that cite this headnote

[13] **Contracts**
Rewriting, remaking, or revising contract
When the terms of a contract are plain, definite, and unambiguous, the court cannot vary these terms.

Cases that cite this headnote

[14] **Attorney and Client**
Dealings Between Attorney and Client
Because a lawyer's fiduciary duty to a client covers contract negotiations between them, such contracts are closely scrutinized.

Cases that cite this headnote

[15] **Attorney and Client**
Dealings Between Attorney and Client
A lawyer has a duty to appreciate the importance of words and detect and repair omissions in client-lawyer contracts.

Cases that cite this headnote

[16] **Attorney and Client**
Contracts for Compensation
**Attorney and Client**
Construction and operation
The goal of an attorney-client fee agreement is to ensure that the client is informed of the terms; this does not mean every dispute over the contract's meaning must be resolved against the lawyer, but whether the lawyer was reasonably clear is determined from the client's perspective.

Cases that cite this headnote

[17] **Attorney and Client**
Contracts for Compensation
Placing the burden on the lawyers to be clear in fee agreements is warranted, given a lawyer's sophistication, the trusting relationship between a lawyer and his client, and a lawyer's responsibility to notify the client of the fee's basis or rate at the outset.

Cases that cite this headnote

ON PETITION FOR WRIT OF MANDAMUS

**Attorneys and Law Firms**

Brendan K. McBride, The McBride Law Firm, San Antonio, Brian Lee Lewis, L. J. Strieber, Mark W. Kiehne, Ricardo G. Cedillo, Davis Cedillo & Mendoza, Inc., San Antonio, Nissa M. Dunn, Houston Dunn PLLC, San Antonio, for Real Party in Interest.

Deborah G. Hankinson, Brett David Kutnick, Joseph B. Morris, Hankinson LLP, Dallas, Alexander Lyle Kaplan, Harry Paul Susman, Kristen Schlemmer, Susman Godfrey, LLP, Houston, Elliott S. Cappuccio, Pulman Cappuccio Pullen & Benson, LLP, San Antonio, Leslie S. Hyman, Pulman, Cappuccio, Pullen, Benson & Jones, LLP, San Antonio, for Relator.

**Opinion**

Justice Willett delivered the opinion of the Court, in which Chief Justice Hecht, Justice Green, Justice Johnson, Justice Guzman, Justice Devine, and Justice Brown joined.

***1** This dispute arises from a contingency fee agreement for legal services. The trial court granted a new trial, in part, because the pertinent agreement "unambiguously" permitted the lawyers to recover an ownership interest as attorney fees. However, we conclude that the trial court's finding was an abuse of discretion because the agreement unambiguously states that the lawyers were only entitled to attorney fees from a monetary recovery. Accordingly, we conditionally grant Davenport's petition for writ of mandamus, directing the trial court to vacate its new trial orders from September 2, 2014, and March 25, 2015, and to render a final judgment consistent with this opinion.

## I. Background

### A. Factual and Procedural Framework

In 1999, Dean Davenport, James Allen, and Mark Wynne formed Water Exploration Co., Lt. ("WECO") as a limited partnership to find, drill for, and produce commercial drinking water, with each partner having an equal interest in the company. A few years later, Davenport's partners claimed Davenport had forfeited his interest. Davenport and Dillon Water Resources ("Dillon"), a company owned by Davenport, hired Haynes and Boone, LLP, to sue Allen, Wynne, and their partnerships for a declaratory judgment that Davenport still had a 33% interest in WECO. The trial court granted partial summary judgment that Dillon "is now and always has been a partner in good standing in WECO."

Two years later, Davenport hired new counsel, Tom Hall and Blake Dietzmann, because he felt no advancements were being made in other pieces of the lawsuit. The lawyers claimed they could win Davenport "a big monetary verdict." Davenport terminated his relationship with Haynes and Boone and hired Hall and Dietzmann. Davenport signed a contingency fee agreement (the "Agreement"). The Agreement states, "It is the purpose of this Agreement to successfully pursue Client's claim arising out of business dealings with WECO." It goes on to provide:

> In consideration for the present agreement of [the Attorneys] to represent [the] Client and the promise to render legal services in the future in pursuit of this claim, [the] Client agrees to sell, transfer, assign and convey to [the Attorneys] an undivided interest in the above claim to be calculated as follows:
>
> **Forty percent (40%) of the gross amount recovered**
>
> **Except that Attorneys will not take a fee out of the ownership of 5 D Water Resources and Dillon Water Services**
>
> ....

**By "GROSS AMOUNT" is meant the total sums recovered.**

The Agreement also states that the lawyers would pay "all reasonably necessary expenses incurred in the prosecution of the case" and that such "sums shall be repaid by Client out of any monies recovered."

Hall and Dietzmann won a $70 million jury verdict for Davenport for conversion of his partnership interest in WECO. However, because the lawyers harbored serious doubts about the strength of the verdict on appeal, they advised Davenport to settle. Davenport successfully settled his claim with Allen. Davenport and Dillon received $200,000 and promptly paid the lawyers the appropriate share in contingency fees. Allen also transferred his 33% interest in WECO to Davenport. Hall negotiated and drafted the settlement agreement. The lawyers claim that they exchanged documents with Davenport to transfer part of his new 66% ownership interest to them, but this transfer never occurred.

***2** Then Wynne, the other WECO partner, appealed the judgment. In an effort to pressure Wynne to settle, Davenport's legal team filed an involuntary bankruptcy petition against Premier General Holdings, Wynne's limited partnership. Hall and Dietzmann litigated and successfully obtained an order from the trial court for a receiver to distribute WECO funds held in the court's registry to Dillon. Dillon paid the lawyers an additional $297,813.30 in attorney fees as their contingent share for these monies, which constituted "sums recovered" in a "claim arising out of business dealings with WECO." Eventually, Davenport and Wynne settled. Davenport bought out Wynne's interest with his own money, now owning 100% of WECO. Once again, Hall and Dietzmann drafted and signed the settlement agreement. The lawyers filed suit against Davenport requesting unpaid attorney fees, alleging they were entitled to an ownership interest in WECO and that Davenport failed to pay expenses of $226,795.01 in the underlying suit.

At trial, the lawyers sought a judgment that would include an ownership interest in WECO as compensation for unpaid attorney fees. The trial court determined that the Agreement was ambiguous and submitted the issue to the jury. The jury found that the lawyers were not entitled to an ownership interest in WECO because Davenport had not agreed in the Agreement that attorney fees could include an ownership interest in WECO. [1] The jury also found that the attorneys had waived any rights they had to an ownership interest and were estopped from seeking any such interest. But the jury did find for the attorneys on their claim for $226,795.01 in unpaid expenses under the Agreement. The lawyers moved for judgment despite the jury's verdict, which was denied. On May 20, 2014, the trial court signed a final judgment for the unpaid expenses plus $1.3 million for attorney fees incurred in the litigation. The lawyers then moved for a new trial, arguing that the jury's conclusion that the contract was unambiguous must be disregarded as a legal finding and sufficient evidence did not support estoppel and waiver. The trial court signed an order granting the motion for a new trial.

Later the court of appeals conditionally granted mandamus relief and directed the trial court to state its reasons for the new trial, to comply with *In re Toyota Motor Sales, U.S.A., Incorporated.* [2] The trial court replaced its original order, stating that the Agreement was unambiguous after all and that the evidence was legally and factually insufficient to support the jury's findings of estoppel and waiver. The court of appeals summarily denied Davenport's second petition for writ of mandamus.

### B. Summary of Issues and Our Disposition

Davenport complains that the trial court improperly nullified a jury verdict in this case, substituting its judgment for that of a jury. Specifically, he argues that the trial court abused its discretion in ordering a new trial based on its finding that the Agreement "unambiguously" provides for the recovery of an ownership interest as attorney fees. We agree. Therefore, we need not reach Davenport's second issue, which claims the trial court abused its discretion in granting a new trial based on legally and factually insufficient evidence to support the jury's estoppel and waiver findings. These were Davenport's affirmative defenses and are no longer relevant because we have already found in his favor. Accordingly, we order the trial court to vacate both of its new trial orders and render a final judgment consistent with this opinion.

## II. Analysis

**[1]** **[2]** A trial court has discretion to grant a new trial for "good cause," however this discretion has limits.[3] An appellate court may by mandamus direct a trial court to vacate a new trial order in one of three ways: (1) when a merits-based review of the record establishes that the trial court abused its discretion, (2) when the trial court's order was void, or (3) when the trial court erroneously finds that the jury's answers to special issues are irreparably conflicting.[4] Because nothing suggests the trial court's order was void, nor that any irreconcilable conflict exists, we only address whether the trial court abused its discretion in granting a new trial. We hold that the trial court abused its discretion in granting a new trial based on its findings that the Agreement "unambiguously" provided for the recovery for an ownership interest as attorney fees.

***3** **[3]** **[4]** The trial court's first explanation for granting a new trial was its post-judgment finding that the Agreement "unambiguously provides that attorneys' fees would be paid out [of] the ownership interest in any business recovered except 5 D Water Resources and Dillon." We summarize our recent, evolving jurisprudence on review of new trial orders: "A new trial order must be understandable, reasonably specific, ... cogent, legally appropriate, specific enough to indicate that the trial court did not simply parrot a pro forma template, and issued only after careful thought and for valid reasons."[5] In today's case, while the trial court's rationale may be "reasonably specific," we do not believe it was issued "for valid reasons."

The lawyers, Hall and Dietzmann, argue that they are entitled to a share of the ownership interest in WECO as payment for their services. Davenport, however, claims the lawyers do not have any rights to his ownership interest because the Agreement does not authorize the lawyers to any non-cash benefits. After examining the Agreement's language, we find no support for the lawyers' assertion. The contract unambiguously allows for Hall and Dietzmann to only recover money in exchange for their legal services.

**[5]** **[6]** **[7]** **[8]** **[9]** The dispute turns on questions of contract interpretation. Whether a contract is ambiguous is a matter of law for the court.[6] A contract is considered ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one interpretation.[7] When construing a contract, the terms are typically given "their plain, ordinary, and generally accepted meaning."[8] Courts may look to dictionaries to discern the meaning of a commonly used term that the contract does not define.[9] An unambiguous document will be enforced as written.[10]

Here, the plain language of the Agreement unambiguously supports Davenport's position. The term "sums" in the contract is the crux of the dispute. The Agreement states that the lawyers will receive "[f]orty percent (40%) of the gross amount recovered" and then later states "[b]y 'GROSS AMOUNT' is meant the total sums recovered." Black's Law Dictionary defines "sum" as "[a] quantity of money."[11] No textual support in the contract indicates "sums" includes an "ownership interest."

The lawyers contend the "except clause" in the Agreement indicates they are entitled to an ownership interest in WECO. The except clause states that the lawyers receive 40% of the gross amount recovered, "[e]xcept that Attorneys will not take a fee out of the ownership of 5 D Water Resources and Dillon Water Services." They essentially argue that, by force of negative implication, a contingent fee clearly would be paid out of the recovery of an ownership interest in a business other than 5D or Dillon. They further argue that if the except clause was not read this way, it would be superfluous. We agree that the except clause alone does not prohibit a non-monetary recovery for the lawyers, but no basis exists to construe the except clause, which explicitly prohibits the lawyers from taking a fee out of two specified companies, to unambiguously mean the lawyers *are* entitled to take a fee out of other ownership interests as a matter of law.

***4** **[10]** The Court must read contractual provisions so none of the terms of the agreement are rendered meaningless or superfluous.[12] But the lawyers request that we infer a positive from a clear negative. While this may be permissible in some cases, it is not possible to infer a positive from this specific negative. The parties agree the except clause was written in the Agreement to make clear that Hall and Dietzmann would not receive any part of Davenport's original 33% interest in WECO, which was confirmed on summary judgment while Haynes and Boone was representing Davenport. The except clause therefore denies the lawyers a fee based on a recovery they did not obtain. It is not indicative

of whether a non-monetary recovery is permissible based on the other provisions of the contract. Additionally, it is not surplusage because the exception clarified an issue unrelated to this dispute.

**[11]** **[12]** **[13]** Courts may not rewrite the parties' contract, nor should courts add to its language.[13] We cannot make new contracts between the parties and must enforce the contract as written.[14] When the terms are plain, definite, and unambiguous, as they are here, the court cannot vary these terms.[15] Accordingly, we find the Agreement unambiguously favors Davenport.

**[14]** **[15]** **[16]** **[17]** Our conclusion is further supported by the special rules this Court has articulated for attorney-client fee agreements. As we stated in *Anglo–Dutch Petroleum International, Inc. v. Greenberg Peden, P.C.*,[16] "[b]ecause a lawyer's fiduciary duty to a client covers contract negotiations between them, such contracts are closely scrutinized."[17] A lawyer has a duty to "appreciate the importance of words" and "detect and repair omissions in client-lawyer contracts."[18] The goal of an attorney-client fee agreement is to ensure that the client is informed of the terms.[19] This does not mean every dispute over the contract's meaning must be resolved against the lawyer, but whether the lawyer was reasonably clear is determined from the client's perspective.[20] Placing the burden on the lawyers to be "clear" in fee agreements is warranted, given a lawyer's sophistication, the trusting relationship between a lawyer and his client, and a lawyer's responsibility to notify the client of the fee's basis or rate at the outset.[21] Specifically to a contingent-fee agreement applied to interests other than money, we have held that the "burden" is on the lawyer "to express in a contract with the client whether the contingent fee will be calculated on non-cash benefits as well as money damages."[22]

Applying these principles here, the trial court had no justification to conclude the Agreement unambiguously entitled the lawyers to an ownership interest in WECO. The Agreement fails to state the fee will be calculated by including non-cash benefits and money damages. Instead, it provides that the fee will be calculated based on "the gross amount recovered," which as stated above, is defined as "the total sums recovered." It would have been simple for the lawyers to include language in the Agreement that would have explicitly allowed for the lawyers to receive a percentage of partnership or other non-cash interests derived from their representation. Because they neglected to do so, and for the reasons set forth above, we find that the Agreement only permits recovery from monetary awards. This is further supported by the fact that the Agreement does not state how recovery from a non-cash award would be calculated.[23] Therefore, the trial court abused its discretion in holding that the Agreement entitles the lawyers to recovery from non-cash benefits, such as the ownership interest in any business recovered.

## III. Conclusion

***5** The trial court abused its discretion by granting a new trial based on its findings that the Agreement "unambiguously" provided for the recovery of an ownership interest as attorney fees. Because the Agreement is unambiguous in favor of Davenport on this question, we do not address Davenport's affirmative defenses of waiver and estoppel. Accordingly, we conditionally GRANT Davenport's petition for writ of mandamus, and direct the trial court to VACATE both of its new trial orders, and to RENDER a final judgment consistent with this opinion. We are confident the trial court will comply, and the writ will issue only if it does not.

Justice Boyd filed a concurring opinion, in which Justice Lehrmann joined.

Justice Boyd, joined by Justice Lehrmann, concurring.

The Client,[1] represented by the Attorneys,[2] settled a lawsuit and received both monetary payments and ownership interests in a business referred to as WECO. Pursuant to their contingency-fee agreement, the Client paid the Attorneys forty percent of the monetary payments. The issue is whether the agreement also requires the Client to give the Attorneys forty percent of the WECO interests. A jury found that the agreement does not. The trial court then concluded that it unambiguously does and granted a new trial. The Court concludes that it unambiguously does not and orders the trial court to set aside the new-trial order and enter judgment for the Client.

Who's being unreasonable here? When a contract's language can reasonably support only one definite or certain meaning, it is unambiguous, and courts must construe it as a matter of law. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). But if the language is fairly susceptible to more than one reasonable interpretation, it is ambiguous and its meaning becomes a fact issue for the jury to decide. *See id.*[3] Is the Client's, jury's, and Court's construction of the agreement unreasonable, as the trial court concluded? Or is the Attorneys' and trial court's construction unreasonable, as this Court concludes?

I conclude that the agreement is ambiguous because it reasonably supports both constructions. The trial court thus erred by deciding that the agreement unambiguously requires the Client to give the Attorneys forty percent of the WECO interests, but this Court errs by deciding that it unambiguously does not. Instead, the agreement's meaning presents a jury issue. The trial court was initially correct to submit it to the jury, and the jury found that the agreement does not require the Client to give the Attorneys the WECO interests. I join the Court's judgment ordering the trial court to vacate its new-trial order and enter judgment for the Client, but I would order the trial court to enter the judgment based on the jury's verdict, not because the agreement unambiguously favors the Client as a matter of law.

***6** The agreement at issue is a contingency-fee agreement between the Attorneys and "Dean Davenport on his behalf and on behalf of related entities, 5D Drilling and Pump Services, Inc., Dillon Water Services, LP, and Wanda Davenport." The agreement's express "purpose" is to "successfully pursue Client's *claim* arising out of business dealings with WECO." (Emphasis added). To that end, the Client expressly authorizes the Attorneys "to act in his ... behalf to obtain satisfaction of *that claim.*" (Emphasis added). In the provision pertinent here, the agreement then states:

> In consideration for the present agreement of [the Attorneys] to represent [the] Client and the promise to render legal services in the future in pursuit of *this claim*, [the] Client agrees to sell, transfer, assign and convey to [the Attorneys] an undivided interest in *the above claim* to be calculated as follows:
>
> **Forty percent (40%) of the *gross amount recovered***
>
> **Except that Attorneys will not take *a fee* out of the ownership of 5D Water Resources and Dillon Water Services**
>
> ....
>
> **By "GROSS AMOUNT" is meant the *total sums recovered.***

(Italics added). The agreement later provides that the Client "acknowledges that any proceeds from *this claim* are to be paid jointly to Client and Attorneys, and Client hereby agrees to properly endorse any and all drafts for the purpose of depositing in the trust account of attorneys for disposition." (Emphasis added).

The Client argues that by defining "gross amount" as the "total *sums* recovered," the agreement unambiguously provides for a contingency fee based only on a percentage of the Client's *monetary* recovery. Because dictionaries define the word "sum" to mean a quantity of "money," and because "[n]o textual support indicates 'sums' includes an 'ownership interest,' " the Court agrees. *Ante* at —— (quoting *Sum*, BLACK'S LAW DICTIONARY (9th ed. 2009); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2289 (1986)). I agree that this is a reasonable construction. The agreement defines the Attorneys' contingency interest as a portion of the "total sums recovered," and "sums" ordinarily refers to money.

The Attorneys note, however, that the agreement expressly identifies the Client's "claim arising out of business dealings with WECO" and grants the Attorneys "an undivided interest" in that "*claim.*" The Attorneys argue, and the trial court agreed, that because the agreement grants the Attorneys an interest in the claim and then provides that the Attorneys will not take a "fee" from the Client's "ownership of" other companies, the agreement unambiguously entitles the Attorneys to forty percent of the WECO interests the Client recovered on the claim. I agree that this is a reasonable construction. The agreement grants the Attorneys an interest in the claim itself, and if that interest by definition only included an interest in *money* recovered, the provision that the Attorneys will not take their "fee" out of ownership interests in 5D and Dillon would have no meaning or effect at all.

The Court concludes that this construction is unreasonable not only because "sums" refers to money, but also because attorneys have a duty to draft "clear" fee

agreements. *Ante* at —— (citing *Anglo–Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 450 (Tex. 2011)). But as the Court acknowledges, that does not mean that an attorney-fee agreement cannot ever be ambiguous or that "every dispute over the contract's meaning must be resolved against the lawyer." *Ante* at —— (quoting *Anglo–Dutch*, 352 S.W.3d at 451). The Attorneys' duty to draft a "clear" agreement merely requires us to construe the agreement by considering how "a reasonable person in the circumstances of the client would have construed" the agreement. *Id.* (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18 cmt. h (AM. LAW. INST. 2000)). In light of the agreement's references to the "claim," the "fee," and "ownership" interests, I believe a reasonable person in the Client's position could conclude that the "gross amount recovered" includes the Client's interests in WECO.

*7 This Court does not often find contracts to be ambiguous, but when an ambiguous contract has come before us, we have had no problem calling it what it is.[4] Because neither the Client's nor the Attorneys' construction of this agreement is unreasonable, the agreement is ambiguous. The trial court thus properly submitted the issue to the jury, and it should now vacate its new-trial order and render judgment for the Client based on the jury's verdict. I do not agree with the Court that the trial court should enter judgment for the Client *as a matter of law*. But because the jury found for the Client and the Court orders the trial court to render judgment for the Client, I respectfully concur.

**All Citations**

--- S.W.3d ----, 2017 WL 2623070, 60 Tex. Sup. Ct. J. 1306

Footnotes

1 The jury likewise found the attorneys were not entitled under the agreement to an interest in WAD, Inc., WECO's general partner.

2 407 S.W.3d 746, 758 (Tex. 2013).

3 TEX. R. CIV. P. 320; *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 210 (Tex. 2009).

4 *In re Toyota*, 407 S.W.3d at 758–59.

5 *Id.* at 757 (internal quotations omitted) (quoting *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688 (Tex. 2012) and *Columbia*, 290 S.W.3d at 213).

6 *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980).

7 *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

8 *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).

9 *Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011).

10 *Heritage Res.*, 939 S.W.2d at 121.

11 *Sum*, BLACK'S LAW DICTIONARY (9th ed. 2009); *see also sum*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986) (defining "sum" as "an indefinite or specified amount of money").

12 *Ewing Constr. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 37 (Tex. 2014); *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010).

13 *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003).

14 *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex. 1965).

15 *Id.*

16 352 S.W.3d 445 (Tex. 2011).

17 *Id.* at 450.

18 *Id.* at 453 (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18 cmt. h (2000)).

19 *Id.* at 451.

20 *Id.*

21 *Id.* at 450, 453; *Levine v. Bayne, Snell & Krause, Ltd.*, 40 S.W.3d 92, 95–96 (Tex. 2001).

22 *Levine*, 40 S.W.3d at 95.

23 The lawyers' proportional interest from the ownership interest in WECO cannot be calculated as a matter of law. Davenport obtained the remaining 67% of WECO through a settlement after a verdict awarded him a 33% interest and damages. This further acquisition was largely due to Davenport's willingness to take on the risk of a troubled business. He even

purchased the last 33% with $3.3 million of his own money. It is unclear how much the lawyers would take as a fee based on a business interest that Davenport purchased on his own.

1 Dean Davenport, Dillon Water Resources, Ltd., 5D Drilling and Pump Service, Inc. f/k/a Davenport Drilling & Pump Service, Inc., 5D Water Resources, LLC f/k/a Davenport Oper., LLC, Water Exploration Co., Ltd., WAD, Inc., Water Investment Leasing Company, LLC, Blue Gold Resources Management, LLC, Blue Gold Properties, LLC, and Blue Gold Development, LLC (collectively, the Client).

2 Tom Hall, Thomas C. Hall, P.C., and Blake Dietzman (collectively, the Attorneys).

3 *See also Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam) ("The jury's task is to decide a fact issue based on the preponderance of the evidence."); *Coker*, 650 S.W.2d at 394 ("When a contract contains an ambiguity, ... the interpretation of the instrument becomes a fact issue.") (citing *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1980)).

4 *See, e.g.*, *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 120 (Tex. 2015) ("[W]e conclude that the endorsement reasonably can be read to support either party's proposed construction and is therefore ambiguous."); *Milner v. Milner*, 361 S.W.3d 615, 619–23 (Tex. 2012) (holding that mediated settlement agreement was ambiguous when it was not clear whether transfer of partnership was conditioned on consent of other partners); *Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 302 (Tex. 1993) ("Because one could reasonably interpret the contract either way, it is ambiguous."); *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993) (holding that contracts were ambiguous when both set out different prices and included provisions "purporting to override the other" contract); *Towers of Tex., Inc. v. J & J Sys., Inc.*, 834 S.W.2d 1, 2 (Tex. 1992) (per curiam) (holding that "geographical coordinates" in lease that describe only a single point was ambiguous); *White v. Moore*, 760 S.W.2d 242, 243 (Tex. 1988) (holding that will leaving mother's estate to her children "and to the survivor or survivors of them" was ambiguous as to whether grandchild whose father had died inherited under will); *Coker*, 650 S.W.2d at 394–95 (holding that divorce decree was ambiguous as to whether husband agreed to pay wife a specified amount of money or whether wife was merely assigned all of husband's interest in commissions); *Neece v. A.A.A. Realty Co.*, 159 Tex. 403, 322 S.W.2d 597, 601 (1959) (holding that form contract containing two captions, one of which should have been deleted, was ambiguous).

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

2005 WL 88997
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, Plaintiff/Counterdefendant,
v.
Howard STEIN, Defendant/Counterplaintiff.

No. Civ.A. 98-CV-4820.
|
Jan. 13, 2005.

**Attorneys and Law Firms**

Dean F. Murtagh, German Gallagher & Murtagh, Gregory S. Capps, Jacobs Law Group, PC, Philadelphia, PA, for Plaintiff.

George Bochetto, Bochetto & Lentz PC, Philadelphia, PA, Henry A. Walsh, Jr., Walsh Law Office, New Hope, PA, for Defendant.

*OPINION*

STENGEL, J.

***1** Northwestern Mutual Life Insurance Company ("Northwestern") filed a declaratory judgment action to compel policyholder Howard Stein to provide information and cooperation in connection with his claim for total disability under a Northwestern disability policy. Mr. Stein asserted several counterclaims, including breach of contract, bad faith, and violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law. Mr. Stein filed a Motion for Summary Judgment on Northwestern's declaratory action in December 2003, which Judge Weiner denied. Northwestern then filed this Motion for Summary Judgment on Mr. Stein's counterclaims. For the reasons set forth below, I will grant Northwestern's motion.

## I. FACTUAL BACKGROUND

Howard Stein purchased a long-term disability income insurance policy (the "Policy") from Northwestern in 1986. The Policy provides for three types of disability benefits: a Proportionate Benefit for Partial Disability, Full Benefit for Total Disability, and Lifetime Benefit for Presumptive Disability. Disability Income Policy, Pl.'s Mem. Supp. Summ. J., Ex. 44. The Proportionate Benefit for Partial Disability is available when the insured is (1) unable "to perform one of more of the principal duties of his occupation" or "spend as much time at this occupation as he did before the disability started" and (2) has "at least a 20% Loss of Earned Income." [1] *Id.* § 1.3. "For each of the first six months in which a Proportionate Benefit is payable, the Owner may choose to receive 50% of the Full Benefit; or to receive a Benefit based on the Insured's Loss of Earned Income." *Id.* The Full Benefit for Total Disability is provided under the Policy for sixty months (the "Initial Period") if the insured is "unable to perform the principal duties of his job." *Id.* § 1.2. The benefit is available even if the insured is able to earn as much or more in a new occupation. *Id.* After the Initial Period, however, benefits cease if the insured is "gainfully employed in any occupation." *Id.* In contrast to the Full Benefit for Total Disability, the Lifetime Benefit for Presumptive Disability is available when the insured experiences a "total and irrecoverable loss of ....use of both hands ..." *Id.* § 1.8. Under the presumptive disability clause, an insured receives lifetime benefits even if he is able to work. The insured need not be "under the care of a physician," but the benefit is provided only "for as long as the loss continues." Section 4.6 of the Policy provides that Northwestern, "at its own expense, may have an insured examined as often as reasonably necessary in connection with a claim." *Id.* § 4.6.

In June 1995, Mr. Stein began experiencing pain and numbness in his shoulder, arm, and hands. He submitted a claim for total disability benefits under § 1.2 in December 1995. *See* Pl.'s Mem. Supp. Summ. J., Ex. 27. In connection with this claim, he furnished tax returns and W-2 forms for 1993 and 1994. *Id.* Northwestern determined that Mr. Stein was partially disabled because he was able to perform the "executive/c onsulting/thinking/analytical/communication aspects of his occupation" and paid 50% of the total benefit from December 1995 to February 13, 1996 when Mr. Stein had arm surgery. *See* Pl.'s Mem. Supp. Summ. J., Ex. 1. In light of its determination that Mr. Stein was only partially disabled, Northwestern repeatedly asked Mr. Stein for additional financial and tax information to evaluate the amount of his benefit. *See, e.g., id.*



Exhibit F

*2 In May 1996, Northwestern requested that Mr. Stein submit to a forensic accounting. Pl.'s Mem. Supp. Summ. J., Ex. 1, at 3. The purported rationale underlying this request was that such a procedure would be the most efficient means to obtain information regarding the impact of Mr. Stein's disability on his income. *See id.* Mr. Stein refused. *See, e.g.,* June 16, 1997 Letter from Howard Stern to James D. Ericson, Pl.'s Mem. Supp. Summ. J., Ex. 28, at 4. There is no provision within the Policy that requires the claimant to submit to a forensic accounting, and Mr. Stein alleges that at the time he purchased the policy, a Northwestern representative told him that a forensic accounting was only required when there were suspicions of fraud. *See id.* at 5. Northwestern later withdrew this request. *See* January 13, 1997 Letter from David Gosse to Howard Stein, Pl.'s Mem. Supp. Summ. J., Ex. 3.

In July 1996, Dr. John Shine examined Mr. Stein. He concluded that Mr. Stein "should be able to do at least part time work" and recommended a conservative course of treatment. He did not recommend surgical intervention, because in his opinion, surgery posed a high risk of injury. *See* Report of Dr. John Shine, Pl.'s Mem. Supp. Summ. J., Ex. 33, at 5.

In August 1996, Northwestern notified Mr. Stein that he would be paid the additional 50% for the December to February period. *See* January 13, 1997 Letter from David Gosse to Howard Stein, Pl.'s Mem. Supp. Summ. J., Ex. 3, at 1 (describing notification). According to Northwestern, this modification was based on Mr. Stein's representation that he did not work during that time, and was therefore entitled to the full amount of the benefit under section 1 .2. *Id.*

In September 1996, Dr. Brennan, Mr. Stein's treating physician, examined Mr. Stein. He noted that Mr. Stein worked as an attorney and that his job included use of a computer and keyboard. Dr. Brennan concluded that Mr. Stein was precluded from doing this type of work "at this time." He approved of surgery, noting that "forestalling any interventional surgery may render [Mr. Stein] potentially myelopathic." *See* Brennan Report, Pl.'s Mem. Supp. Summ. J., Ex. 34, at 2.

On November 4, 1996, Dr. Perry Shear, a neurological specialist, examined Mr. Stein. He also recommended surgery. *See* Shear Report, Pl.'s Mem. Supp. Summ. J., Ex. 35.

In February of 1997, Northwestern learned that Mr. Stein had begun working as an insurance consultant at Community Association Underwriters of America, Inc. *See* February 21, 1997 Letter from David Gosse to Howard Stein, Pl.'s Mem. Supp. Summ. J., Ex. 4. Northwestern made repeated requests for information about Mr. Stein's employment and income in order to make determinations regarding his continuing eligibility for benefits. *See, e.g., id.;* March 25, 1997 Letter from Darlene Bruesewitz to Howard Stein, Pl.'s Mem. Supp. Summ. J., Ex. 5. In April 1997, Northwestern reduced Mr. Stein's benefits by 50% due to his failure to provide such information.

*3 In July 1997, Mr. Stein submitted a claim for the Presumptive Lifetime Benefit for Total Disability. He did not withdraw his total disability claim. *See* Pl.'s Mem. Supp. Summ. J., Aff. of Darlene Bruesewitz, May 10, 2004. Northwestern denied the presumptive disability claim because they did not agree that Mr. Stein had a "total and irrecoverable loss" of the use of both hands. *See* October 8, 1997 from John Gosse to Howard Stein, Pl.'s Mem. Supp. Summ. J., Ex. 15; November 21, 1997 Letter from John M. Grogan to Howard Stein, Pl.'s Mem. Supp. Summ. J., Ex. 17. This evaluation was based upon Dr. Brennan's records, and the analysis of those records by Northwestern consultant, Dr. Henry Alba. *See* Gosse Dep., Pl.'s Mem. Opp. Summ. J., Jan. 16, 2004, at 70.

In November of 1997, Northwestern notified Mr. Stein that they had decided to consider him totally disabled. *Id.* Northwestern again increased Mr. Stein's benefits retroactively to provide full benefits for the period from April to November. *Id.* No reason for this retroactive payment was given.

The sixty month period for total disability benefits ended in 2000. At that time, Northwestern had paid all the total disability benefits to which Mr. Stein was entitled-$174,036. *See* Bruesewitz Aff. ¶ 4.

In May 1998, Mr. Stein's physician, Dr. Brennan, sent Northwestern additional information about Mr. Stein's condition. *See* May 28, 1998 Letter from Dr. Michael J. Brennan to Sharon M. Raymond, Pl.'s Mem. Supp. Summ. J., Ex. 39. In his letter, Dr. Brennan concluded that

Mr. Stein was "suffering from severe pain and functional impairment resulting in total disability from his own occupation as well as all other occupations." *Id.* The information was based on an exam that Dr. Brennan conducted in May of 1997.

Northwestern requested that Mr. Stein submit the following: (1) Request for Disability Benefits Forms on a quarterly basis; (2) Attending Physician Statements, completed by a physician who had treated him within thirty days of the completion of the form, on a semi-annual basis; (3) federal income tax returns on an annual basis; (4) written authorization to obtain medical and employment records on an annual basis; (5) a description of current job duties, hours of work, and rates of pay within thirty days of any change of employer or circumstance of employment; and (6) consent to an evaluative medical exam by a Northwestern-chosen physician at Northwestern's cost on an annual basis. *See* August 7, 1998 Letter from Dean F. Murtaugh to Howard Stein, Def. Mem. Opp. Summ. J ., Ex. 18. Mr. Stein refused.[2] *See* Aug. 29, 1998 Letter from Howard Stein to James D. Ericson, Pl.'s Mem. Supp. Summ. J., Ex. 32.

Northwestern initiated its declaratory judgment action, and Mr. Stein counterclaimed. In his counterclaims, Mr. Stein contends that Northwestern breached the contract by failing to timely and properly administer the claim, acted in bad faith, and violated the Unfair Trade Practices and Consumer Protection Law. Northwestern has moved for summary judgment on these counterclaims.

***4** Following the initiation of this action, Dr. James Hunter examined Mr. Stein at Mr. Stein's request. He noted that Mr. Stein had no useful pinch in his left hand, and that he had approximately a twenty pound grip in his right hand, which "can be sustained as long as he does not move his arm out to the side of his body." *See* January 29, 2001 Letter from James M. Hunter to Stephen J. Springer, Def.'s Mem. Opp. Summ. J., June 22, 2004, Ex. 3, at 6-8. He found that Mr. Stein's capacity to pinch with his right hand was "about 4 pounds and it can be sustained and it enables [Mr. Stein] to have certain personal activities which are essential in his daily life." *Id.* at 8. He concluded that Mr. Stein was "totally and permanently disabled from work and from useful functional activity, even minimal use of his hands, except as mentioned above." *Id.*

Northwestern's independent medical examiner, Dr. Lee Osterman, also examined Mr. Stein in early 2001. Dr. Osterman noted that Mr. Stein had "no significant atrophy," "[h]is grip strength is non-physiologic and consistent with poor effort," and "he absolutely does not have a total loss of use of both hands nor a total or irrecoverable loss of use of both hands." *See* May 2, 2001 Letter from A. Lee Osterman to Dean Murtagh, Def.'s Mem. Opp. Summ. J., June 22, 2004, Ex. 4, at 9.

At various times in 1999 and 2002, Northwestern conducted video surveillance of Mr. Stein, which shows him driving, closing his car door, grabbing a cup from the roof of his car, opening his mailbox, unlocking his car, thumbing through his mail, and carrying groceries. *See* Surveillance Footage, Pl.'s Mem. Supp. Summ. J., Ex. 53.

## II. STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." FED. RULE CIV. PROC. 56(c). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Highlands Ins. Co. v. Hobbs Group LLC,* 373 F.3d 347, 350-51 (3d Cir.2004). Once the moving party has carried its burden, the nonmoving party must come forward with specific facts to show that there is a genuine issue for trial. *Williams v. West Chester,* 891 F.2d 458, 464 (3d Cir.1989). A fact is "material" if its resolution will affect the outcome under the applicable law, and an issue about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must draw all justifiable inferences in favor of the nonmoving party. *Highland,* 373 F.3d at 351.

## III. MR. STEIN'S BREACH OF CONTRACT CLAIM[3]

Mr. Stein alleges that Northwestern failed to timely and properly administer his claim and that he is entitled to presumptive lifetime benefits. He has filed two claims with Northwestern, a claim under the total disability provision (§ 1.2) and a claim under the presumptive disability provision (§ 1.8). Mr. Stein's breach of contract action stems from Northwestern's denial of his claim for lifetime

benefits pursuant to the presumptive disability provision (§ 1.8). Because I find that the presumptive disability provision is unambiguous and because the undisputed facts demonstrate that Mr. Stein has not experienced a "total and irrecoverable loss" of the use of his hands as required by that provision, I will grant Northwestern's Motion for Summary Judgment on this count.

***5** Section 1.8 provides that "[e]ven if the Insured is able to work, he will be considered totally disabled if he incurs the total and irrecoverable loss of ... use of both hands." The Insured need not "be under the care of a physician" and the benefit "is payable for as long as the loss continues during the lifetime of the Insured." Mr. Stein contends that the presumptive disability provision is ambiguous, that as such, it must be construed in his favor as the insured. I disagree. Read in the context of the entire policy, I find that the language of section 1.8 is clear and unambiguous.

As the Third Circuit noted:

> A Court should read the policy provision to avoid ambiguities, if possible, and not torture the language to create them. A provision of an insurance policy is ambiguous if reasonably intelligent men on considering it in the context of the entire policy would honestly differ as to its meaning.

*Niagara Fire Ins. Co. v. Pepicelli, Pepicelli, Watts and Youngs, P.C.*, 821 F.2d 216, 220 (3d Cir.1987) (*quoting Northbrook Ins. Co. v. Kuljian Corp.*, 690 F.2d 368, 372 (3d Cir.1982)). There are very few cases that deal with the exact language in Northwestern's presumptive disability provision. *But cf. Arnold v. Life Ins. Co. of N. Am.*, 894 F.2d 1566 (11th Cir.1990) (holding that appellant did not have "entire and irrecoverable loss of sight" when he was able to improve his vision with corrective lenses); *Horvatin v. Allstate Life Ins. Co.*, 848 F.2d 1012 (9th Cir.1988) (finding that "[c]onstruing 'loss' of a foot by 'severance' to include lower body paralysis is ... a forced construction."); *Arnold v. Equitable Life Assurance Soc'y of the United States*, 189 Ga.App. 66, 374 S.E.2d 782 (Ga.App.1988) (same); *Smith v. Great Am. Life Ins. Co.*, 125 Ga.App. 587, 188 S.E.2d 439 (Ga.App.1972) (finding that appellant who could see only glimmers of light, but who had about 69% vision in his eye with corrective glasses had not suffered an "irrecoverable loss of the entire sight."). The Illinois Court of Appeals, however, dealt with a similar provision in *Lang v. Monarch Life Insurance Co.*, 75 Ill.App.3d 938, 94 N . E.2d 751 (1979). In *Lang*, the court found that the plain and unambiguous meaning of the phrase "total and irrecoverable" denoted "a loss of use both complete and permanent." *Id.* at 754. I agree. Likewise, in an unpublished opinion, the Sixth Circuit upheld a grant of summary judgment where the lower court found that an insured was not "totally" disabled for purposes of a presumptive disability provision where he was able to drive, use a razor, and pour milk. *Nakfoor v. Continental Assur. Co.*, 1995 U.S.App. LEXIS 10460 (6th Cir. May 9, 1995). Although neither of these cases is binding on this court, the logic underlying these decisions is persuasive.

In this case, as in *Nakfoor*, "the focus ... must be on whether the tasks [Mr. Stein] can perform constitute some practical use of his hands." *Id.* at *4. In his deposition, Mr. Stein stated that he is able to shower, brush his teeth, shave with an electric shaver, dress himself, feed himself, and sign his name-though admittedly all with great difficulty. Stein Dep., Pl.'s Mem. Supp. Summ. J., at 280-85, 295. Mr. Stein's wife testified that he is able to use a computer mouse, operate a dictation machine, take out the garbage, and hold the leash while walking his dog. Elissa Stein Dep., Pl.'s Mem. Supp. Summ. J., at 32, 73, 76, and 92. Similarly, co-worker Elaine Neiman testified in her deposition that she had seen Mr. Stein use a computer keyboard, and that with difficulty, he was able to carry a drink in his hands or pour a drink into a cup. *See* Def.'s Mem. Opp. Summ. J., Neiman Dep., Ex. 7, at 10, 19. Northwestern's surveillance video also shows Mr. Stein using his hands in a variety of ways-driving, closing his car door, grabbing a cup from the roof of his car, opening his mailbox, unlocking his car, thumbing through his mail, and carrying groceries-and clearly establishes that he has at least some use of his hands. [4]

***6** Mr. Stein relies on Dr. Brennan's letter of May 1998, his subsequent deposition testimony, and Dr. Hunter's report as evidence to create a genuine issue of material fact sufficient to withstand Northwestern's Motion for Summary Judgment. I find that this evidence is insufficient as a matter of law. Dr. Brennan's letter stated in relevant part that Mr. Stein was "suffering from severe pain and functional impairment resulting in total disability *from his own occupation as well as all other occupations.*" *See*

May 28, 1998 Letter from Dr. Michael J. Brennan to Sharon M. Raymond, Pl .'s Mem. Supp. Summ. J., Ex. 39 (emphasis added). Dr. Brennan's letter, however, merely supported a finding of total disability under the Policy, which requires that a claimant be "unable to perform the principal duties of his job," in contrast to the presumptive disability provision which requires a total loss of the use of both hands. In his deposition, Dr. Brennan testified as follows:

Q: On May 28th [1998] when you wrote this letter as reported to Northwestern [sic]

A: "It is my medical opinion that Mr. Stein is suffering from severe pain and functional impairment resulting *in total disability from his own occupation as well as from virtually all other occupations."*

Q: Did you reach a conclusion at that time as to whether or not Mr. Stein had a total loss of use of either of his hands?

A: Based on my sentence the conclusion would be that at that point in time he had *a loss of function of his hands and was totally disabled.*

Brennan Dep., Def.'s Mem. Opp. Summ. J., Ex. 2, at 31-32 (emphasis added). His testimony explaining his position in 1998, however, is undercut by his subsequent testimony. After reviewing the surveillance tape, Dr. Brennan opined that Mr. Stein was able to perform a variety of "fine motor skills with his hands and fingers, and that he "certainly doesn't suffer from a total and irrecoverable loss of function of his hands based on viewing that tape." [5] *Id.* at 45-49.

Likewise, Dr. Hunter's report is insufficient to create a genuine issue of material fact. Mr. Stein cites a single sentence from Dr. Hunter's report, which if read in isolation *might* support his claim of presumptive disability. Indeed, Dr. Hunter opined that Mr. Stein was "totally and permanently disabled from work and from useful functional activity, even minimal use of his hands, except as mentioned above." *Id.* The final clause of that sentence, however, is the operative one. Dr. Hunter's report, read in its entirety, actually supports Northwestern's position. Specifically, he stated that although Mr. Stein had no useful pinch in his left hand, he noted Mr. Stein had approximately a twenty pound grip in his right hand, which "can be sustained as long as he does not move his arm out to the side of his body." *See* January 29, 2001 Letter from James M. Hunter to Stephen J. Springer, Def.'s Mem. Opp. Summ. J., Ex. 3, at 6-8. He found that Mr. Stein's had a capacity to pinch with his right hand was "about 4 pounds and it can be sustained and it enables [Mr. Stein] to have certain personal activities which are essential in his daily life." [6] *Id.* at 8. Because Mr. Stein is able to use his hands for "personal activities which are essential in his daily life," he has not lost the practical use of his hands as required by the language of section 1.8.

*7 Beyond the specific language of the provision, the contract as a whole also supports Northwestern's interpretation. The policy at issue in this case provides for three types of disability coverage to account for varying degrees of disability. In *Morgan v. Prudential Insurance Company of America,* 86 Wash.2d 432, 434-35, 545 P.2d 1193 (1976), a case cited by Mr. Stein, the Washington Supreme Court found that the "loss by severance of both hands at or above the wrist" was susceptible to two interpretations and that an overly narrow reading would frustrate the parties' intentions. Unlike *Morgan,* a strict reading of the presumptive disability provision in Northwestern's policy would not defeat the intention of the parties, because the insured can-and in Mr. Stein's case, has-received benefits under the total or partial disability clause. *Cf. Nakfoor,* 1995 U.S.App. at 6 ("Here the contract has two provisions-one which provides benefits for inability to perform one's occupation and one which provides coverage for total and irrecoverable loss. In this light, [the insurer's] contention that total and irrecoverable loss provision is intended to provide an additional heightened level of benefits is a plausible reading of the contract."). Because the presumptive disability provision is unambiguous-particularly when read in the context of the other related provisions-and the evidence establishes that Mr. Stein did have some practical use of his hands, I find that he did not suffer a "total and irrecoverable" loss of the use of his hands. Northwestern's Motion for Summary Judgment on Mr. Stein's breach of contract claim is therefore granted.

## V. MR. STEIN'S BAD FAITH CLAIM [7]

Mr. Stein also alleges that Northwestern acted in bad faith in violation of Pennsylvania law. Section 8731 permits a court to award interest on a claim, punitive damages, court costs and attorneys' fees against an insurer who acts

in bad faith. 42 PA. CONS.STAT. § 8371 (2004). In the insurance context, "bad faith" is defined as "any frivolous or unfounded refusal to pay proceeds of a policy ..." *Polselli v. Nationwide Mut. Fire Ins. Co.,* 23 F.3d 747, 751 (3d Cir.1994). Negligence or bad judgment, however, does not support a bad faith claim. *Id.* To establish a claim for bad faith, a plaintiff must prove that the insurer (1) lacked a reasonable basis for denying benefits and (2) knew of or recklessly disregarded its lack of a reasonable basis. *Klinger v. State Farm Mut. Auto. Ins. Co.,* 115 F.3d 230, 233 (3d Cir.1997) (citations omitted). A claim of bad faith requires a proof by clear and convincing evidence, and therefore, the burden on the party opposing summary judgment on such a claim is correspondingly higher. *Quaciari v. Allstate Ins. Co.,* 998 F.Supp. 578 (3d Cir.1997) ("The fact that plaintiff's burden at trial is higher than preponderance of the evidence means that plaintiff's burden in opposing summary judgment is higher as well.").

***8** Mr. Stein makes the following allegations of bad faith:

1. Northwestern unreasonably denied his claim for presumptive disability benefits.

2. Northwestern refused to conduct an independent medical examination to determine his eligibility for presumptive disability benefits.

3. Northwestern made unreasonable demands for financial and medical information, including a demand for a forensic accounting, arbitrarily reduced his monthly benefit by fifty percent, and chronically changed its reasons for these reductions.

With respect to each of these claims, I find that Northwestern has established a reasonable basis for the actions it took, and that Mr. Stein has failed to meet his burden in opposing summary judgment.

A. Unreasonable Denial of Presumptive Disability Benefits

As set forth above, Mr. Stein did not have a "total and irrecoverable" loss of the use of both hands. Because Northwestern's ultimate determination about the meaning of the presumptive disability provision was correct, I cannot find that Northwestern lacked a reasonable basis for denying benefits pursuant to section 1.8.

B. Failure to Conduct an Independent Medical Examination

In a closely related claim, Mr. Stein alleges that Northwestern acted in bad faith when it failed to properly investigate his claim for presumptive disability benefits by refusing to conduct an independent medical exam. The case law makes clear that "[s]ection 8731 is not restricted to an insurer's bad faith in denying a claim," but "may also extend to the insurer's investigative practices." *O'Donnell v. Allstate Ins. Co.,* 1999 Pa. 161, 734 A.2d 901, 906 (Pa.Super.1999). However, as noted in *Cantor v. Equitable Life Assurance Society of the United States,* 1999 U.S. Dist. LEXIS 4805 (E.D.Pa. Apr. 12, 1999), an "insurance company ... is not required to show the process by which it reached its conclusion was flawless or that the investigatory methods it employed eliminated possibilities at odds with its conclusion."

Northwestern's decision to deny Mr. Stein presumptive disability benefits was based upon its review of Dr. Brennan's records, and the analysis of those records by Northwestern consultant, Dr. Henry Alba. *See* Gosse Dep., Pl.'s Mem. Opp. Summ. J., Jan. 16, 2004, at 70. Prior to the initiation of the presumptive disability claim, Mr. Stein and Northwestern corresponded concerning the possibility of an independent medical evaluation. *See* January 13, 1997 Letter from David Gosse to Howard Stein, Pl.'s Mem. Supp. Summ. J., Ex. 3, at 2; June 16, 1997 Letter from Howard Stein to James Ericson, Pl.'s Mem. Supp. Summ. J., Ex. 28, at 7-9; July 25, 1997 Letter from David Gosse to Howard Stein, Ex. 11, at 1. Although Mr. Stein stated in his June 16, 1997 that he had always been amenable to such an examination, he went on to say: "Get a doctor and you can have your exam. However, before hand I want to see the plan, all questions and requirements for my own doctors [sic] review. And, I expect you to pay for my doctor's presence at that exam which is for my protection. Since you are so concerned about my well-being, I'm sure you'll have no objection." June 16, 1997 Letter from Howard Stein to James Ericson, Pl.'s Mem. Supp. Summ. J., Ex. 28, at 7-9. Northwestern, as the moving party, has produced evidence that Mr. Stein refused to submit to an independent evaluation unless Northwestern complied with the conditions he set forth. Mr. Stein, by contrast, has not come forward with sufficient facts-particularly in light of the higher burden on a bad faith claim-to show that Northwestern lacked a reasonable basis for failing to conduct an independent medical examination

or that Northwestern recklessly disregarded its lack of a reasonable basis.

C. Requests for Financial and Medical Information and Reduction in Monthly Benefit

***9** Pursuant to section 4.3 of the Policy, a claimant is required to submit written proof of disability "within 90 days after the end of each monthly period for which benefits are claimed." Northwestern denied Mr. Stein's claim because the reports he provided from his treating and consulting physicians were insufficient to support a finding that Mr. Stein was unable to perform the principal duties of his job, specifically, the cognitive and analytical aspects of his profession. *See* May 2, 1996 Letter from Darlene Bruesewitz to Howard Stein, Pl.'s Mem. Supp. Summ. J., Ex. 1, at 1; May 31, 1996 Letter from Darlene Bruesewitz to Howard Stein, Pl.'s Mem. Supp. Summ. J., Ex. 2; January 13, 1997 Letter from David Gosse to Howard Stein, Pl.'s Mem. Supp. Summ. J., Ex. 3, at 1. However, because Northwestern determined that he was unable to perform some of his duties, Northwestern considered him eligible for the partial disability benefit pursuant to section 1.2, and paid him fifty percent of the total disability benefit as set forth in the Policy. Northwestern notified Mr. Stein that he might be eligible for the full benefit amount under section 1.2 if he was not working. When he provided this employment information, Northwestern retroactively gave him the full benefit amount, and continued to do so until April 1997 when Northwestern obtained notice that Mr. Stein had begun working at Community Underwriters Association.[8] Mr. Stein received partial disability benefits until November 1997, when Northwestern determined to consider him totally disabled under section 1.2. In its letter to Mr. Stein notifying him of this decision, Northwestern noted:

We continue to have reservations about your claim, borne in many respects from the lack of information we have been provided regarding your current work activity for and earned income from CAU. Nevertheless, we have decided to resolve these questions, at this time, in your favor. In so doing, we recognize and are aware that your cervical condition appears to be progressive and likely will continue to deteriorate, until such time as you undergo surgery as recommended to you by Dr. Shear at Connecticut Neurosurgical Specialists.

In establishing the appropriate onset for total disability, we have decided to give you the further benefit of the doubt by using the date of your examination by Dr. Shear, November 4, 1996. I will ask one of our analysts to calculate and pay whatever additional benefits may be owed based on this determined onset for total disability.

I believe it is important to underscore, Mr. Stein, that while we have resolved in your favor the matter of your present disability status, you will need to cooperate with us in the future and provide periodic updates to us on your health, treatment and activities in order that we may continue to administer your claim. In particular, you will need to let us know if and when you have the surgery that Dr. Shear recommended and which Dr. Brennan has discussed with you.

***10** To be eligible for total disability benefits pursuant to section 1 .2, an insured must establish that he is "unable to perform the principal duties of his job." If the claimant is able to perform some of those duties, he is eligible for partial disability benefits if he has "at least a 20% loss of Earned Income." These requirements necessitate an inquiry into an insured's medical and financial status. *See Zakeosian v. Provident Life and Accident Ins. Co.*, 1999 U.S. Dist. LEXIS 6292, at *5 (E.D.Pa. Apr. 26, 1999) ("It is axiomatic that when an insured makes a claim for disability benefits, the insurer is entitled to all relevant medical records, not only in order to evaluate the claim initially, but to verify the continuation of the alleged disability."); *Schindler v. Berkshire Life Ins. Co.*, 1999 U.S. Dist. LEXIS 10414, at *2 (E.D.Pa. July 9, 1999) ("An insurer is not precluded by its payment of disability benefits from subsequently requesting information from the insured as part of its investigation of the insured's claim."). Mr. Stein had filed claims for both total and presumptive disability benefits. As discussed above, Northwestern properly denied Mr. Stein's presumptive disability claim, and I find that Northwestern's requests for medical and financial information pursuant to the total and partial disability provisions had a reasonable basis, and therefore, do not constitute bad faith. The subsequent decisions to increase or reduce his claim benefits similarly were not "frivolous" or "unfounded."

With respect to the request for a forensic accounting, Northwestern never made benefit payments contingent upon his submission to such a review. *See* May 2, 1997 Letter from Darlene Bruesewitz to Howard Stein, Pl.'s

Mem. Supp. Summ. J., Ex. 1; Bruesewitz Aff., ¶ 3. Rather, Northwestern offered to facilitate the assembly and submission of his financial information by sending an accountant to review Stein's records on-site. *Id.* In a letter of May 2, 1997, Northwestern explained:

The additional information we anticipate obtaining through such a review includes but is not necessarily limited to the following:

• A detailed breakdown of your insurance consulting duties (using the descriptions you have provided to date as a starting point).

• The financial status of your business prior to and since the onset of your disability.

• An understanding of the basis(es) for your remuneration by your clients.

• The names of your major clients.

• How you bill for your work, the number of weekly and monthly billable hours prior to and since the onset of your disability.

• Amounts of remuneration received for work performed prior to and since the onset of disability.

• Examples of all types of services you provide and work you produce for clients.

• Have you had to refuse work/projects offered to you since the onset of disability? If so, provide details. What reason did you give your clients? Was the work referred to someone else?

***11** • Are your clients aware of your disability? What have you told them with regard to when you anticipate being able to resume work for them?

• What projects/work were you engaged in and/or had you accepted when your disability began? Have they been completed? If so, how by whom and when? If not, what is their current status? What work have you done on them since the onset of your disability?

• A copy of your 1995 filed Federal income tax return

• Copies of your 1995 monthly or quarterly income and expense statements for 1995.

The value of the forensic accountant is that through interacting with you directly and having immediate access to all records of your business, we can often reach closure on many of the issues noted above. The accountants used are familiar with our contract and in many cases can help clarify the financial requirements of our policy. They are also helpful from the standpoint of identifying specific areas of income or expenses which are impacted by your disability, which you may have overlooked.

Because the calculation of the proportionate benefit is "intended to compensate for a loss of earned income caused by the insured's disability," Disability Income Policy, Pl.'s Mem. Supp. Summ. J., Ex. 44, at § 1.4, the information Northwestern was seeking was relevant to Mr. Stein's claim, particularly in light of the fact that prior to the onset of his disability, Mr. Stein operated his own consulting business, "Howard Stein Consulting." *See* Stein Dep., Pl.'s Mem. Supp. Summ. J., Ex. 52, at 52-55.[9] Mr. Stein refused Northwestern's request for a forensic accounting,[10] and Northwestern ultimately withdrew its request. Northwestern has come forward with evidence regarding their basis for requesting a forensic accounting. Mr. Stein has not pointed to any evidence to show that there is a genuine issue of material fact for trial. Therefore, I will grant Northwestern's motion for summary judgment.

## VI. MR. STEIN'S CLAIM PURSUANT TO THE UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

Much like his bad faith claim, Mr. Stein argues that Northwestern violated the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. Ann. §§ 201-1 *et seq.*, by repeatedly requesting financial and medical information that he was not required to provide under the terms of the Policy. "In Pennsylvania, only malfeasance, the improper performance of a contractual obligation raises a cause of action under the Unfair Trade Practices and Consumer Protection Law...." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 307 (3d Cir.1995) (citations omitted). Moreover, as noted by the court in *Yeager's Fuel v. Pennsylvania Power and Light Company*, 953 F.Supp. 617, 668 (E.D.Pa.1997),

the language of the UTPCPL "sounds in deception, misrepresentation, confusion, disparagement, and fraud." Because Mr. Stein has not provided any support for his allegations that Northwestern's request for medical and financial information constituted malfeasance or that Northwestern acted fraudulently, I will grant Northwestern's Motion for Summary Judgment on this statutory claim.

VII. CONCLUSION

***12** In conclusion, I find that the presumptive disability provision is clear and unambiguous. Northwestern properly and reasonably denied Mr. Stein's claim pursuant to section 1.8. Moreover, because Northwestern was contemporaneously administering Mr. Stein's claim for total disability, there was a reasonable basis for Northwestern's requests for information and subsequent benefit decisions. Furthermore, Northwestern's investigation (or lack thereof) had a reasonable basis. Thus, there is no genuine issue of material fact as to the bad faith or unfair trade practices claims. Northwestern's Motion for Summary Judgment is hereby granted.

An appropriate order follows.

*ORDER*

AND NOW, this day of January, 2005, upon consideration of Plaintiff's Motion for Summary Judgment and Defendant's Response thereto, it is hereby ORDERED that Plaintiff's Motion is GRANTED. All of Defendant's counterclaims against Northwestern Mutual Life Insurance Company are dismissed with prejudice.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 88997

Footnotes

1 The proportionate benefit amount equals Full Benefit x Loss of Earned Income/Base Earned Income. Disability Income Policy, Pl.'s Mem. Supp. Summ. J., Ex. 44, at § 1.4. "Earned Income" is defined as "[t]he sum of salary, wages, commissions, fees, bonuses, and other compensation or income earned by the Insured from all sources for work performed by him; less normal and customary business expenses." *Id.* "Base Earned Income" is defined during the first twelve months of disability as "the average monthly Earned Income of the Insured for a 12 consecutive month period during the 24 month period before the start of disability; or any two of the five calendar years before the start of disability." *Id.* The period which generates the highest average is used. *Id.* After the first twelve months of disability, base earned income equals Average Monthly Income x Consumer Price Index for the Current Year of Disability/Consumer Price Index for the Year Disability Started. *Id.* The Policy provides that "[t]he Company may require proof, including income tax returns, of the amount of Earned Income for periods before and after the start of the disability." *Id.*

2 Though not a direct refusal, Mr. Stein's letter to Northwestern CEO James Ericson is easily understood as such. Specifically, it stated:

For my part, you may advise your attorney as follows: (1) I will not be bullied by his or anyone else's deadlines, threat's to sue, subterfuge or other forms of coercion and deceit no matter how they might be disguised as 'good faith efforts....' Especially when those furtively evocative threats to bring suit fail to state either a specific cause of action or the nature and relief of the remedy sought. (2) I will hold him an his law firm responsible for having full knowledge of all the information contained in *every single piece* of correspondence that NML and I have exchanged since the beginning of this matter. Here's my cause of action ...

... If, on the basis of information that is now, and has for some time been, in NML's possession, a suit by NML against me constitutes either abuse of process or malicious prosecution or a similar or related cause of action, as I believe it would, Mr. Murtaugh and his firm will find themselves on the defense along with you.

Aug. 29, 1998 Letter from Howard Stein to James D. Ericson, Pl.'s Mem. Supp. Summ. J., Ex. 32.

3 The contract in this case was delivered in Connecticut, where Mr. Stein resided at the time he purchased the Policy. However, he has lived in Pennsylvania since late 1996. A federal court sitting in diversity applies the choice of law rules in which it sits. *St. Paul Fire & Marine Ins. Co. v. Lewis,* 935 F.2d 1428, 1431 n. 3 (3d Cir.1991). "Under Pennsylvania choice of law analysis, a court must first look to see whether an actual conflict exists between the laws of the competing jurisdictions. If there is no difference between the laws of the forum state and those of the foreign jurisdiction, the court may bypass the choice of law issue and rely interchangeably on the law of both states, although presumably the law of

the forum state applies." *Liebman v. Prudential Fin., Inc.,* 2003 U.S. Dist. LEXIS 21048, at *5-6 (E.D.Pa. Nov. 17, 2003) (citations omitted). The parties agree that there is no material difference between Pennsylvania and Connecticut law, and therefore, I will apply Pennsylvania law.

4 Mr. Stein contends that the relevant time period to evaluate his claim is when he first submitted it to Northwestern in July 1997, and that surveillance footage and evidence from any later time period is irrelevant. However, because Mr. Stein testified that the functional capacity of his hands had not changed from 1996 through the date of his deposition, evidence from that time period is indeed relevant. Stein Dep., Pl.'s Mem. Supp. Summ. J., Ex. 52, at 235, 248-52.

5 *See supra* note 4.

6 The parties stipulated at oral argument that Dr. Hunter is unavailable to testify on deposition or at trial. *See* Transcript of Argument, Nov. 6, 2004 (not yet available).

7 Because Mr. Stein lived in Pennsylvania when most of the circumstances giving rise to his statutory claims took place, Northwestern does not contest the application of Pennsylvania law on his bad faith and unfair trade practices claims. *See* Pl.'s Mem. Supp. Summ. J. at 15.

8 Mr. Stein failed to notify Northwestern of his change in employment status. Northwestern discovered this information when a Northwestern representative called Mr. Stein's contact number and realized it was a place of business. February 21, 1997 Letter from David Gosse to Howard Stein, Pl.'s Mem. Supp. Summ. J., Ex. 4.

9 For a description of the calculation of the proportionate disability benefit, see *supra* note 1.

10 For example, in his letter of June 16, 1997, Mr. Stein wrote: "The only financial information you were ever entitled to is information that substantiates a reduction in my income-*from my occupation*-of at least 80% from the predisability level. Anything else is none of your business. That's right, Mr. Ericson, none of your business. Nevertheless, you have not only demanded much more financial information than that and [sic] you have demanded much more than mere financial information." June 16, 1997 Letter from Howard Stein to James D. Ericson, Pl.'s Mem. Supp. Summ. J., Ex. 28, at 4.

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.